526 N.W.2d 859 (1995)
In re the MARRIAGE OF Elias C. JACOBO and Judith A. Jacobo.
Upon the Petition of Elias C. Jacobo, Appellant,
And Concerning Judith A. Jacobo, Appellee.
Elias C. JACOBO, Plaintiff,
v.
IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, Defendant.
No. 93-1371.
Supreme Court of Iowa.
January 18, 1995.
*861 Theodore F. Sporer, Des Moines, for appellant.
Jay P. Roberts and Eric W. Johnson of Beecher, Rathert, Roberts, Field, Walker & Morris, P.C., for appellee.
Considered by CARTER, P.J., and LAVORATO, NEUMAN, SNELL, and TERNUS, JJ.
SNELL, Justice.
Elias C. Jacobo appeals rulings of the district court which modified the dissolution decree of Elias and his former wife, Judith A. Jacobo and found him in contempt of court. The district court held him in contempt for willfully and deliberately disobeying court rulings which ordered him to pay specified amounts of alimony to his former wife, child support for his children, and the college expenses of his children. Subsequent to Elias' filing of an appeal of the modification and contempt order, the trial court ordered Elias arrested and extradited from Florida for his failure to obey the court's orders. Elias now appeals the trial court's modification, its contempt ruling, the propriety of its order issued after he filed an appeal, and the constitutionality of the statute authorizing his extradition for failure to pay court-ordered support. Elias has also filed a petition for writ of certiorari seeking review of the finding that he is in contempt of court. We have consolidated this action with the appeal from the modification of the dissolution decree. We affirm in part and reverse in part on the appeal. We sustain the writ.

I. Factual Background
The parties' marriage was dissolved on June 21, 1982. A stipulation the parties filed in accordance with the decree, granted them joint custody of their three (then minor) children, Jennifer Leigh Jacobo, Kelly Jane Jacobo, and Jason Andrew Jacobo. The stipulation placed primary physical placement of the children with Judith which meant generally, that the children would reside with Judith during the school year and with Elias during the summer months.
The parties stipulated that even though Judith intended to move to Michigan, it was in the best interests of the children that Iowa retain jurisdiction for as long as Elias maintained his domicile and residence in Iowa, and until the children attained majority. The stipulation noted that Judith had been *862 diagnosed and received treatment for a malignant brain tumor and provided that if she should become unable to care for the children, Elias would attain custody of Kelly and Jason.
The stipulation provided that Elias was to pay to Judith $402 for support of the children, or $134 per month for each child until they attained majority or left home. If, after graduation from high school, any of the children chose to continue their education, the stipulation provided that Elias would "support said child and pay for the cost of said education." If the child had trust funds available to pay for the additional education, Elias was only responsible for that portion of education and reasonable living expenses the trust funds did not cover.
The stipulation further required Elias to maintain medical and dental insurance for the minor children and pay all such expenses which insurance did not cover. It required Elias to maintain health insurance for Judith and pay any medical expenses she incurred which insurance did not cover. Elias further agreed to maintain at least $100,000 in life insurance with Judith named as a primary beneficiary and the children named as contingent beneficiaries. Elias was also to pay Judith alimony in the amount of $2300 per month until her death or remarriage.
In January of 1985, the parties filed a Joint Application for Modification of the decree seeking to alter the primary physical placement of the children. The district court subsequently modified the decree to: (1) place primary physical placement of Jason with Elias; and (2) require Elias to pay child support to Judith for Jason only during the summer months in which Jason was to stay with Judith. The court also held Elias was not required to pay to Judith unpaid child support for months in which Jason had actually lived with Elias.
On April 14, 1987, Elias filed a petition seeking modification of the divorce decree on the ground that he entered into the original stipulation based on his belief that Judith would not survive her illness. He asserted that the absence of her premature death amounted to a substantial change in circumstances. On May 27, 1987, Judith filed an answer to Elias' petition as well as her own modification petition seeking an increase in Elias' alimony and child support obligations.
On April 25, 1988, the district court denied Elias' request to decrease alimony on the ground that he failed to demonstrate that Judith had recovered from her illness to the point she could be gainfully employed. The court denied Judith's request for an increase in alimony on the ground that the original alimony request had been based in part on an assumption that she would ultimately need nursing and home care, and this did not occur. The court noted that the children had incurred substantial medical bills and Judith was in fear of Elias and therefore had not tried to collect the amounts from him. The court required Judith to provide Elias with all medical bills insurance had not paid, and ordered Elias to pay those amounts within thirty days of receiving the bills.
With regard to child support, the court noted that the only child remaining at home at the time of the order was Kelly. The court held that Kelly's progression into her "teens" constituted a material change in circumstances and therefore raised Elias' support obligations for her from $134 to $300 per month. The court also ordered that once Judith provided Elias with proof that Jennifer was enrolled in college and taking a normal course load, he would be responsible for paying her educational expenses. The court also held that Elias was to pay $134 per month to Judith for the support of Jennifer for those months Jennifer attended college. The order further continued the requirement that Elias maintain the life insurance referred to in the original stipulation. The court of appeals affirmed the district court's decision on August 23, 1989.
On March 31, 1992, Judith filed a new Application for Modification of Decree requesting that the court increase Elias' alimony obligation because a deterioration in her health had decreased her earning capacity and increased her medical expenses while Elias' income had substantially increased. On the same date, she also filed an Application for Contempt Citation requesting that *863 the court hold Elias in contempt for numerous failures to pay court-ordered support.
In her Application for Contempt Citation, Judith stated that even though Elias' alimony payment was $2300 per month, he reduced his payment to $1300 in July and August of 1989, did not pay any alimony in February of 1990, and otherwise has only paid $2000 per month since August of 1989. Judith further asserted that Elias had completely failed to maintain health insurance or pay the medical expenses of herself and the children. She also stated that Elias has failed to pay the required child support associated with Jennifer and Kelly and failed to pay for the educational expenses of the children.
By order dated April 12, 1993, the district court held that Judith's health had substantially deteriorated, that Elias had attempted to secrete assets and understate his wealth, but that even so his financial condition was shown to have substantially improved. Due to these material changes in circumstances, the court ordered Elias' alimony obligation to be increased from $2300 per month to $3500 per month.
With regard to the contempt issues, the court found that Elias and Judith had in fact entered into a temporary agreement to allow Elias to reduce his alimony payments "for a few months," but that the parties did not agree to a permanent reduction of the payments to $2000 per month. The court held Elias in contempt for willfully and deliberately (1) failing to pay Judith the required $2300 per month in alimony; (2) failing to pay Judith child support for Jennifer and Kelly; and (3) failing to pay all but $3500 of a total of $30,407 in educational expenses Jennifer incurred at Temple University.
Specifically, the court held Elias responsible for: (1) $28,300 in past-due alimony; (2) $16,288 in past-due child support; (3) $27,000 in college expenses; and (4) $15,600 in increased alimony amounts due from March 1992 to April 1993. The court ordered that a warrant be issued for Elias' arrest as punishment for the contempt with mittimus withheld for thirty days during which Elias had an opportunity to establish a plan for payment of the delinquent amounts. If Elias did not present an agreement to the court ensuring the prompt and timely payment of the amounts at issue, the court ordered that at the end of the thirty days Elias would be arrested and remain in custody until he paid the amounts in full or provided satisfactory arrangements for their payment. On August 24, 1993 the district court entered a ruling which amended the court's April 12, 1993 order primarily to reduce the past-due alimony amount from $16,288 to $14,900.
On September 22, 1993, Elias filed a notice of appeal challenging the district court's orders to the extent they involved rulings adverse to him. On the same day, Elias filed a Petition for Writ of Certiorari with this court, challenging the orders' adjudication of contempt. On September 24, 1993, the district court found Elias had made no attempt to obey the court's contempt orders. The court therefore issued a warrant for Elias' arrest and held that he should remain in custody for 180 days or until the amounts ordered were paid in full. The court further found that Elias was properly charged under Iowa Code section 252A.24.1 (1993) and ordered the Black Hawk County Attorney to take action under section 252A.24 to have Elias extradited to Iowa from Florida to serve the sentence at issue.
We granted Elias' petition for writ of certiorari regarding the district court's April and August 1993 contempt orders. Our order stayed the district court's judgment pending further order of this court. Thereafter Elias filed a second Petition for Writ of Certiorari which requested that this court review the legality of the district court's September 24, 1993 order. In his petition, Elias asserted that the September 24, 1993 order was legally erroneous and amounted to an abuse of discretion for three reasons. First, he asserted his September 22 Notice of Appeal divested the district court of jurisdiction to enter the September 24 order. Second, he contended the interstate rendition provisions of section 252A.25 of the Iowa Code are inapplicable to this matter so that extradition is not available. Elias' final assertion was that our October 15, 1993 order staying the district court's judgment stayed enforcement of the district court's September 24, 1993 order. We granted Elias' second petition for *864 writ of certiorari on November 12, 1993. We have subsequently consolidated Elias' two writs and appeal for a single treatment of this matter.
On appeal, Elias asserts four arguments: (1) the district court erred in granting Judith's request for an increase in alimony because there has not been a substantial and material change in circumstances; (2) substantial evidence does not support the court's conclusion that Elias was in contempt for violating the requirements of the modified decree; (3) Elias' filing of his notice of appeal and first writ of certiorari divested the district court of jurisdiction so that it did not have jurisdiction to enter its September 24, 1993 order; and (4) Iowa Code section 252A.24 is void because it violates Article IV, Section 2, Clause 2 of the United States Constitution.

II. Modification of Decree

A. Standard of Review
We review a district court's modification of a dissolution decree de novo. Iowa R.App.P. 4; In re Marriage of Lee, 486 N.W.2d 302, 304 (Iowa 1992); Myers v. Myers, 195 N.W.2d 113, 114 (Iowa 1972). We give weight to the trial court's findings of fact but they do not bind us. In re Marriage of Sjulin, 431 N.W.2d 773, 776 (Iowa 1988). Even though we engage in a de novo review, we will not disturb the trial court's conclusions unless there has been a failure to do equity. In re Marriage of Wahlert, 400 N.W.2d 557, 560 (Iowa 1987).

B. Substantial Change in Circumstances
A party who seeks a modification of a dissolution decree must establish by a preponderance of the evidence that there has been a substantial change in circumstances since the entry of the decree or its last modification. Lee, 486 N.W.2d at 304; In re Marriage of Bergfeld, 465 N.W.2d 865, 870 (Iowa 1991). Iowa Code section 598.21(8) provides in relevant part:
In determining whether there is a substantial change in circumstances, the court shall consider the following:
a. Changes in employment, earning capacity, income or resources of a party.
....
c. Changes in the medical expenses of a party.
....
e. Changes in the physical, mental, or emotional health of a party.
. . . .
1. Other factors the court determines to be relevant in an individual case.
See Sjulin, 431 N.W.2d at 776. Modification can only be justified by a change in circumstances the trial court did not contemplate at the time of entrance of the original decree or at the time of a subsequent intervening modification proceeding. In re Marriage of Full, 255 N.W.2d 153, 159 (Iowa 1977); In re Marriage of Aronow, 480 N.W.2d 87, 89 (Iowa App.1991); In re Marriage of Skiles, 419 N.W.2d 586, 588 (Iowa App.1987).

C. Analysis
The trial court held that Judith established a substantial and material change in circumstances by demonstrating by a preponderance of the evidence that: (1) Judith's health had deteriorated considerably since the last modification; and (2) Elias' financial condition had considerably improved. We agree with the trial court's analysis.
In its 1988 modification, the trial court held that the $2300 per month alimony award in the original 1982 decree contemplated Judith's gradual deterioration to a point at which she would need nursing and home care. Although the need for nursing and home care did not arise, the court held that in 1988, the $2300 per month alimony payments were appropriate for Judith's continued disabled condition as it existed at that time. It was certainly within the contemplation of the original decree that the $2300 figure would adequately provide for Judith if she continued in a slowly-deteriorating condition without recovering her full health. Since the court did not find that Judith had dramatically improved nor dramatically deteriorated from the condition contemplated in *865 the original decree, it held that the $2300 figure was appropriate for her condition as it existed at the time of the 1988 modification hearing.
The record shows that Judith's health has taken a substantial downturn since the 1988 modification. In 1988, she was employed part-time as a nurse's aide and earned approximately $4000 per year. She is now unemployed and completely unable to work due to a deterioration in her short-term memory, eyesight, and general health. Her balance has deteriorated and she has fallen at least three times in the last year. Although she continues to have a license to drive, she is unable to drive at night and experiences difficulties resulting from her defective short-term memory.
Judith's sister, Jane Reynolds, testified at the modification hearing. She stated that she has observed Judith's deterioration and has noted a substantial decrease in her vitality since 1988. Jane has taken over Judith's finances due to Judith's inability to oversee them effectively in recent years. The record amply demonstrates that Judith has carried her burden of showing a material change in her condition.
The record also shows that Elias' financial situation has substantially improved since the last modification. This is true despite his attempt to convince us his financial condition has dramatically deteriorated. Elias has repeatedly failed to properly document his financial status. He failed to file a financial statement in accordance with the 1993 modification order. He also failed to produce satisfactory financial records despite court orders entered on July 28 and September 10, 1992.
In 1988, Elias claimed a financial net worth in excess of $900,000, and now claims a net worth of approximately $84,000. He claims this deterioration has occurred due to his own poor management of his finances. Specifically he cites the following losses: (1) approximately $350,000 from transfer of part of his 1988 Northern Iowa urological pension into foreign currency investments; (2) losses from a failing real estate partnership; (3) losses from investments in Panamanian firms and real estate which were adversely affected by the United States' invasion of Panama; and (4) losses from investments in stocks. The only support he provides for these assertions is his own testimony.
For numerous reasons, the trial court found Elias' testimony unreliable. It was convinced that Elias has been secreting assets in order to avoid his obligations. We give considerable weight to a trial court's assessment of the credibility of witnesses. In re Marriage of Vrban, 359 N.W.2d 420, 423 (Iowa 1984); In re Marriage of Johnson, 499 N.W.2d 326, 327 (Iowa App.1993). For the same reasons alluded to by the trial court, we find Elias' testimony regarding his financial condition generally unreliable.
Examples of Elias' unreliability abound within the record. Although Elias testified that his current income is about the same now as it was in 1988, or approximately $205,000 gross, the information he has provided us indicates that in 1991 his adjusted gross income was approximately $341,000. He would have us believe that the undocumented difference in his cost of doing business in Florida rather than in Iowa would reduce his current income to approximately the same net amount he earned in 1988 in Iowa. Adding nothing to his case are his exhibits of 1991 tax returns with photocopies of his current wife's illegible and irrelevant W-2 forms superimposed so that the tax return figures are obscured.
At trial, Elias testified that he currently resides in a home worth $400,000 upon which he owes approximately $300,000. He claims he sold his home in Waterloo, Iowa for $245,000 when he owed only $70,000 on it and invested the difference in his current home. This suggests an equity in the current home of more than the claimed $100,000.
Elias' residence is titled solely in the name of his current wife, Nancy L. Jacobo. The couple also owns a second home in Sarasota, Florida which is titled in both their names. Elias has not provided us with the value of his second home. In 1988, Elias owned cars valued at $32,000. Today he owns cars valued at approximately $86,000.
*866 After a thorough review of the record we find that Elias has made an unsuccessful and irresponsible attempt to disguise a substantial improvement in his financial condition. Judith has met her burden of demonstrating a substantial change in circumstances since the last modification. We therefore find that the trial court's increase of Elias' monthly alimony obligation from $2300 to $3500 is warranted and affirm the court's ruling.

III. Contempt

A. Standard of Review
When we review a ruling of contempt by certiorari, we determine whether substantial evidence supports the district court's judgment. Ervin v. Iowa Dist. Court for Webster County, 495 N.W.2d 742, 744 (Iowa 1993); Palmer College of Chiropractic v. Iowa Dist. Court for Scott County, 412 N.W.2d 617, 619 (Iowa 1987). Since proof beyond a reasonable doubt must establish a finding of contempt, "substantial evidence" sufficient to support such a finding is "such evidence as could convince a rational trier of fact that the alleged contemner is guilty of contempt beyond a reasonable doubt." Ervin, 495 N.W.2d at 744-45; Palmer College, 412 N.W.2d at 619; see Phillips v. Iowa Dist. Court for Johnson County, 380 N.W.2d 706, 709 (Iowa 1986). In addition, the district court's conclusions of law do not bind us and we exercise unfettered review of the court's application of the law. State v. Lipcamon, 483 N.W.2d 605, 606-07 (Iowa 1992).

B. Applicable Law and Analysis
In order to find a person guilty of contempt, a court must find beyond a reasonable doubt that the individual willfully violated a court order or decree. Iowa Code § 598.23; Phillips, 380 N.W.2d at 709. The contemnee has the burden of demonstrating that the contemner had a duty to obey a court order and failed to perform the duty. Skinner v. Ruigh, 351 N.W.2d 182, 185 (Iowa 1984). The burden then shifts to the contemner to produce evidence which suggests he or she did not willfully violate the order or decree at issue. Id. However, the burden of persuasion remains on the contemnee to prove beyond a reasonable doubt that the contemner willfully acted in violation of the court order. Ervin, 495 N.W.2d at 745; Skinner, 351 N.W.2d at 185. Since the burden of persuasion remains on the contemnee, even if the contemnee makes a prima facie case and the contemner does not produce any evidence, the court must still analyze the contemnee's evidence to determine whether it establishes a willful violation beyond a reasonable doubt. Skinner, 351 N.W.2d at 185.
Evidence establishes willful disobedience if it demonstrates:
conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemner had the right or not.
Ervin, 495 N.W.2d at 744 (quoting Amro v. Iowa Dist. Court, 429 N.W.2d 135, 140 (Iowa 1988)). The law only requires the contemnee to prove that some of the violation was willful in order to establish contempt. Ervin, 495 N.W.2d at 744. The only defense available to a contemner, other than absence of willfulness in disobeying the order, is indefiniteness or uncertainty of the order at issue. Bevers v. Kilburg, 326 N.W.2d 902, 904 (Iowa 1982).

1. Alimony
The trial court held Elias guilty of contempt for three reasons: (1) improper unilateral reduction of his monthly alimony payments; (2) failure without good cause to pay child support for Jennifer and Kelly; and (3) failure to pay $27,000 in college expenses Jennifer incurred. A thorough review of the record does not demonstrate that substantial evidence supports the court's contempt adjudication in these areas.
Elias reduced his alimony payments from the court-ordered $2300 to $1300 per month during July and August of 1989 and paid $2000 per month thereafter. The trial court held that the record demonstrated beyond a reasonable doubt that Elias' payment reductions constituted a willful and deliberate violation of the court's alimony order. We do not find substantial evidence in the record to support this finding.
*867 At the modification hearing, Elias claimed Judith and he had entered into an agreement for the lowering of the alimony payments. It was Elias' understanding that the agreement was for a permanent lowering of the amount of the payment. Judith testified that she understood the agreement to be that Elias would merely reduce his payments while he was moving and setting up his practice in Florida, but he would ultimately repay the deficiency and would resume payment of $2300 per month. Judith's sister, Jane Reynolds, testified that she was aware the agreement existed and the trial court held that such an agreement did exist.
Elias may have in fact believed in the propriety of the agreement. Due to existence of this possibility, we are unable to find that Elias' violation of the alimony order was willful beyond a reasonable doubt. However, we note that a modification of a support order is void unless the court approves the modification after proper notice and an opportunity for a hearing. Iowa Code § 598.21(8). We have recently noted:
Strong public policy supports [section 598.21(8) ]. The courts should be loath to sort through numberless disputed claims of undocumented private agreements concerning support obligations. A matter so important should be clearly fixed and authorized by court order. Only in this way can support be effectively enforced. The statute spares the courts from the impossible task of separating fact from fiction in claims of the parties' private understandings.
In re Marriage of Harvey, 523 N.W.2d 755, 756 (Iowa 1994). Therefore, we sustain the writ of certiorari challenging the trial court's finding of contempt. Notwithstanding this decision, we find that Elias is responsible for payment of the entirety of the amount by which his payments have been below those ordered by the court.
We affirm the trial court's holding that for the period from July 1989 to March 1992, Elias is responsible for $14,900 in unpaid alimony. He is also responsible for $3500 per month from March of 1992 to present. If he has continued to pay $2000 per month, he is responsible for the deficiency of $1500 for thirty-four months from March of 1992 through December of 1994. This amounts to $51,000. We therefore find that Elias is responsible for a total of $65,900 in unpaid alimony if he has not paid the previous amount due and has continued to pay $2000 per month. Elias carries the burden of demonstrating the amount he has paid.

2. Child Support
The trial court held Elias guilty of contempt for ceasing his payment of child support for Kelly and Jennifer. Elias asserts that the relevant court orders only required him to pay support for Kelly until she graduated from high school. He further asserts that he has in good faith failed to pay Jennifer's support due to Judith's failure to provide him with documentation of Jennifer's educational endeavors.
The original dissolution stipulation provided that Elias was to pay child support for the three, then minor, children of $134 per month until "that minor child for whom the amount is being paid reaches the age of 18 years or graduates from high school, whichever occurs last, becomes emancipated, married, self-supporting or deceased, whichever condition shall first occur." The stipulation also provided that "[i]n the event that one or more of the minor children elects to continue his or her education ..., then [Elias] agrees to support said child and to pay for the cost of said education." (Emphasis added.) While this sentence might suggest Elias' delineated support payment obligation was to continue if one of the children continued school beyond high school, the entirety of this section of the stipulation, considered as a whole, suggests the support obligation was to end when, generally, the child at issue reached eighteen or graduated from high school. Therefore, absent a court order to the contrary, Elias' $134 per month support obligation for Kelly came to an end when she graduated from high school.
In the 1988 modification decree, the court ordered explicitly that Elias was to continue to pay $134 per month for the support of Jennifer for the months she has been and continues to be in college. The court also *868 raised Elias' support obligation for Kelly from $134 to $300 per month, but did not indicate that it should continue when Kelly began college. We therefore find that Elias is not guilty of contempt for failing to pay the specified monthly support obligation for Kelly while she has been in college since no court order has ever required him to do so. However, Elias was still responsible for payment of child support for Kelly until she graduated from high school and Respondent's Exhibit 2 suggests Elias did not pay the support during her senior year of high school. Therefore, he is responsible for $300 per month for the period running from September 1989 to May of 1990, or $2700.
With regard to Jennifer's support, we note that the 1988 order held that Elias would be responsible for all costs of education when Judith provided him substantiation of the times during which Jennifer had attended school and the associated costs. Prior to Judith's 1993 contempt and modification filing, she had failed to provide Elias with appropriate substantiation of Jennifer's time of attendance or cost of education as the court ordered in the 1988 modification. We therefore find that the record does not demonstrate that Elias' failure to pay Jennifer's support was a deliberate violation of the court's order. Although we sustain the writ regarding his conviction for contempt, we find that he is responsible for $134 per month for each month Jennifer attended college. Respondent's Exhibit 2 indicates Jennifer attended college in the fall of 1986, spring of 1987, spring and fall of 1988, and spring of 1989. Elias is responsible for four months' support per semester or for twenty months unpaid child support for Jennifer amounting to $2680. In total, Elias owes $5380 for the support of Kelly and Jennifer.

3. College Expenses
The dissolution stipulation originally provided that Elias would be responsible for the support and costs of education of any of the three children that attended college. The April 1988 modification order held that Elias would be responsible for these expenses when Judith provided him with substantiation that Jennifer was enrolled in college and taking a normal course load. In a 1989 order, the court clarified that Judith was required to
submit to [Elias] documentation concerning college expense incurred for Jennifer Jacobo. The court is not attempting to specify what type of information should be provided, but it should constitute good documentation concerning the nature and extent of expenses which Jennifer has incurred for her college education.
The trial court found that Judith had not provided Elias with substantiation of the education costs of Kelly and Jennifer prior to Judith's filing of her request for modification and contempt. The court therefore did not find Elias in contempt for failing to pay those amounts. However, the court found that before the filing, Judith had provided Elias with substantiation of $30,407 in costs Jennifer had incurred at Temple University. The court held Elias in contempt for failing to pay approximately $27,000 of these bills.
We find that the documentation Judith provided Elias with prior to her filing did not constitute the "good documentation" the 1989 order required. Absent Judith's submission of proper substantiation of the education expenses of Jennifer and Kelly, we are unable to find substantial evidence to support the trial court's holding that Elias willfully and deliberately disobeyed the court's educational support orders. We therefore sustain the writ of certiorari challenging the court's finding of contempt.
However, Elias remains responsible for those expenses Judith has documented. We review de novo the record of educational expenses we have been provided in order to determine the amount of Elias' liability. Looking to Respondent's Exhibit 2, we determine that Jennifer attended school in the fall of 1986, spring of 1987, spring and fall of 1988, and spring of 1989. Jennifer's tuition and fee expenses for these periods appear to have been: (1) for the fall of 1986 and spring of 1987, $2923; (2) for the spring and fall of 1988, $3111. We do not assess a tuition amount for the spring of 1989 because of Elias' approximately $3500 payment. Elias is responsible for payment to Judith of these expenses for Jennifer's tuition and fees.
*869 Judith also claims that Elias should reimburse her for the costs of room and board and books for Jennifer estimated at $2341 and $250 respectively. We find that the proof submitted is inadequate to support these claims, which are therefore denied. With regard to Kelly's expenses, we note that Elias has not challenged the propriety of the requested figure Judith has asked for in the documents she has submitted. Our review of the record shows that $20,398 is a reasonable figure for the expenses of Kelly's education through the fall of 1992.

IV. Conclusion
Since we sustain the writ of certiorari challenging the trial court's contempt adjudications, we do not address Elias' remaining contentions. Regarding the appeal from the modification of the dissolution decree, we affirm the trial court's increase of Elias' alimony obligation from $2300 to $3500. We also find that Elias is responsible for the following sums: (1) $65,900 in unpaid alimony, assuming he has continued to pay $2000 per month since March of 1992; (2) $5380 in unpaid child support for Kelly and Jennifer; (3) $14,439 in unpaid educational expenses for Jennifer; and (4) $20,398 in unpaid educational expenses for Kelly. Elias carries the burden of demonstrating he has paid any of these sums.
Elias is assessed three-fourths of the costs of this action and Judith is assessed one-fourth of the costs of this action.
AFFIRMED IN PART AND REVERSED IN PART ON THE APPEAL; WRIT OF CERTIORARI SUSTAINED.